Secretary of the United States Department of Health and Human Services Mr. Roth for the appellants, Mr. Liu for the appellate. Mr. Roth, good morning. Good morning. May it please the Court. Robert Roth, Cooper Lundy, and Bookman for the appellant hospitals.    and that the appellant is not eligible to receive an appellate. The appellants set aside the Secretary's day outlier thresholds because they were not likely to produce projected payments within the statutory range, stating, where the agency has failed to provide a reasoned explanation or where the record belies the agency's conclusion, we must undo its actions. Appellants asked this Court to undo the Secretary's cost outlier thresholds for 2004 to 2006 because the Secretary determined them after abandoning the approach she herself found not only to be most appropriate, but mandated by the outlier statute to be adopted on an emergency basis as part of the outlier correction rule. Instead, the Secretary issued the outlier correction rule using the regular notice and comment process and then, in the rulemaking at issue, calculated the thresholds not only without using the approach that she had set a few months earlier as a statutory mandate, but without ever revealing the approach she believed to be most appropriate. Remarkably, this occurred only a few short years after this Court in County of Los Angeles invalidated the Secretary's day outlier thresholds for the same behavior, that is, failing to account for a trend that the Secretary knew would cause outlier payments to sink below the statutory threshold. The 2004 to 2006 thresholds must be set aside because the Secretary has failed to provide a reason or explanation for her actions, has failed to address the alternative she herself considered mandatory, and calculated the thresholds using a methodology that not only was facially irrational in disregard of her own data, but as in County of Los Angeles, was not likely to produce the projected payments within the statutorily mandated range. All right, let me ask you. She did reduce in 2004 the outlier threshold by 37%. Correct, Your Honor. All right, and then in 2005 she reduced it by 26%, 06 by 8%, but it's now, as I understand it, at 23,000-something for those three years, and a low point of 23,000. And your group requested 20,000 in sort of raw numbers. Am I correct about that? Well, I think for the years at issue, in light of the changes that were made by the outlier correction rule, the hospital's comments went down to about 25,000 per 04, then 23,000 and 22,000 in succeeding years, and saying that if this cost methodology had been used, it would have been close to 20,000, Your Honor. That's correct. Okay, and then let me also see if this is correct. I calculated from the turbochargers being 2% of the hospitals that treat Medicare patients, that that would be 6,300 hospitals that treat Medicare patients. When you add together the turbochargers, 123, 126, your clients, 186, that's only 5% of Medicare providers. Right. And I'm trying to figure out if HHS, and this is speculative, if HHS satisfied 95%, well, even more than that, because I don't know if the turbochargers were satisfied or not, but almost 95% of the Medicare providers, and you're only $2,000 or $3,000 apart on the outlier threshold, it just seems like it is less than a titanic struggle when you realize how huge this program is. And it seems inevitable to me that HHS would have to make some people unhappy. Very valid questions, Your Honor, and let me address them in this way, that the way that outliers work, it's a zero-sum amount of money. Right. And so what happened is that the amount that was diverted to these 123 turbocharging hospitals deprived the other 98%, the other approximately 4,000 hospitals, of the payments they were entitled to. Completely? What's that? Completely? Well, some entirely and some mostly. Including your hospitals? Oh, absolutely, including our hospitals. Right, because what the Secretary found is that there was a raise in the threshold from about $20,000, $21,000 in 2002 to $33,000 in 2003. And I think for all these years at issue, the numbers should have been in the low 20s, $22,000, $23,000, just what Administrator Scully told Congress. And what Administrator Scully told Congress and what the Secretary found in the interim final rule was almost the entirety of that increase from $21,000 to $33,000 was because of these turbocharging hospitals. They diverted to themselves so much money that one hospital got overpaid, according to Administrator Scully's testimony, $60 million in one year, that a chain refunded refused to accept $57 million a month, $750 million over the course of a year. And that's money that was detracted from every other hospital in the country because the outlier threshold was set so high that some hospitals didn't hit it. And even the hospitals that did hit it, they were deprived of the delta that they would have gotten if the threshold had been set accurately. Right, and from what I understand, what makes it tough is the cap, the 5% to 6% cap. In other words, if you had unlimited funds, then you could reimburse everybody, but it can only be 5% to 6% of the DRG reimbursement. Isn't that right? The concern is not that the cap limits the payments, it's that the cap has to be set realistically. And the Secretary here set a cap that she knew, she absolutely knew would not hit the minimum 5% or the 5.1%, and it came short by $1.5 billion just in 2004 alone, and then $3 billion total, Your Honor. But the point is that for the hospitals that are involved and the hospitals that protected their appeal rights, this is an enormous big deal because it provides payment for the most sick, for the sickest of the patients. Those are the patients who are in the hospital longest who incur the highest amount of cost. And the problem here is, again, in the county of L.A., this court kind of looked away from the results-oriented approach that the hospitals had requested at that time, not focusing simply on the shortfall, but really focused on the process. And the process here was flawed. It was fatally flawed because the Secretary knew that she couldn't use this inflation factor that she had been using historically without mitigating it by cost-to-charge ratios. And in the final rule, what she had said is, you know what, we need to exclude the charging factor, from the charging factor, the information from the turbocharging hospitals, from those 123 hospitals. Let me ask you about those hospitals. Am I right about this? We don't know who they are? I think they were disclosed in the information. Are they all in urban areas? Are they all trauma hospitals? Well, they wouldn't be trauma necessarily for Medicare, but with big dialysis units, I know Medicare takes care of dialysis, regardless of your age. Do we have a description of these turbochargers? We have a description, and what was so amazing about these turbocharging hospitals is that, for example, what Administrator Scully said in his testimony and what was reflected in the record of this case, even what was published in the Federal Register, is that small community hospitals that historically had had outlier payments in the 3% or 4% range were getting payments at 100% of their DRG amounts. So they were getting where they should have had nothing more than 3% or 4%. And the turbocharging hospitals as a group, as a group, historically, if you look before the turbocharger began in 2000, were getting about 8.9% of their DRG amount in outlier payments. And once turbocharging went into effect, they got 28% of their DRG amounts and amounted to 24 of all outlier payments across the country. So 24% of the outlier payments were being diverted to these hospitals, and they weren't necessarily trauma centers. They were your everyday community hospital who in no way were entitled to, had, would be expected to have the kind of cases that would lead to payments, outlier payments at that level. You have relied heavily on the County of Los Angeles as the case, I guess, most analogous to this case. But it seems to me that at the very least, you have several different operations here. You have 04, you have 05, you have 06. And things are changing across that time. I mean, the Secretary is making adjustments. So are you saying that in each of those years you consider the explanation to have been inadequate? Or are you looking at some particular part of that? The, Judge Brown, we're looking at it the way the Secretary does, which is all of these years are intertwined. The outlier payments in particular look back two, three, four years, draw on data from previous times, draw on experience from previous time. But the problem that was endemic in 2004 that was solved by the Secretary in interim final rule was also endemic in 2005 and 2006. And it's simply this. So even though there's a change there because she's beginning to use the actual data, in other words, the corrected reports, it seems to me this was kind of a moving target. I mean, it's different in 04 than it is in 06. And it seems to show that because, in fact, the gap is closing. Oh, there's no question that the Secretary on the one side with the inflation factor improved her projections by using a more realistic inflation factor. But the problem here, I have to get technical just for 30 seconds, is that in order for the outlier projection to be realistic, as the Secretary acknowledged in the interim final rule, is that the inflation factor, whatever it is, has to be mitigated by updated cost-to-charge ratios so that the projections are realistic. And what happened here is that in 05 and 06, the Secretary did a little better on the projections of the inflation factor but entirely ignored any change to the cost-to-charge ratios. And what's interesting, Your Honor, and totally inconsistent, is in 2004, in the final rule for 2004, the Secretary recognized this problem, recognized this very problem, and said that there are 50 hospitals that are subject to this thing she called reconciliation. And so she said, I've got to project different cost-to-charge ratios for them because we don't really think it's realistic to use those 50. We think those 50 are the same as the 123. She doesn't explain how the 123 in the proposed rule and in the interim final rule became 50. But what she said was, we've got to try to calculate something different. In 2005 and 2006, she abandoned that entirely, made no effort to account for the changes in cost-to-charge ratios. But didn't she? In fact, the agency abandoned what you keep referring to as the interim final rule, right? So as I understand it, that was something that was proposed that went to O&B, and then they abandoned that approach. Well, it depends on what you mean by abandoned. They certainly abandoned the methodology. Almost all of the interim final rule showed up in the proposed outlier correction rule, but not the methodology. And to the extent that this court is looking to defer to anything under rural sale, your Honor's decision, or any of the precedent that was mentioned in those other cases, what it's supposed to be deferring to is to the agency expertise that was exercised in accordance with the delegation from Congress here in an area of uncertainty in prediction and projections. The deference that this court owes is most owed to the interim final rule, because that is the unalloyed, the unvarnished position of the agency of agency expertise. It was not until it went to O&B, and as Administrator Scully testified before Congress, that there were some budget analysts who questioned the secretary. Budget analysts. The deference from the Congress, the delegation from Congress, was not to budget analysts at O&B. And so it goes back to HHS, and when it went back to the secretary, the secretary was free to change her approach, but at that point she needed to explain why. She needed to explain why in what she presented to O&B that went through entire approval of the entire agency, what... Well, excuse me for interrupting you, but the problem here, it seems to me, is that, you know, if this rule had been something that they had put out there, and it was a rule, and they then changed their mind, they would have to explain that. But what you're saying is they have to explain a process that was going on when they were deliberating about what to do. And that seems different to me. Yeah, well, Your Honor, the deliberations were over. This was signed by the secretary, signed by the administrator of CMS, and went to O&B. It was the final product. Now, clearing through HHS is a monumental task by itself. It has to clear all of the agencies within HHS. So this was, until O&B got involved, the secretary believed this was going to be published as in in the Federal Register. Now, the point is that we're not saying it was binding policy. We're not saying the secretary couldn't change her mind. But what she never explained, even though she hinted at these 123 in the proposed outlier correction rule and in these hospitals in need for reconciliation, is fundamentally why, in addressing the comments that came from the industry, how come she didn't account for the turbocharging data, the data from these turbocharging hospitals? In the interim final rule, she said, we need to exclude it. We need to exclude it both from the inflation side, and we need to exclude it both from the cost-to-charge ratio side, because we don't know where the hospital is going to be on the cost-to-charge ratio side. And in the 2004, they said, well, we need to do something about it. But, Your Honor, ultimately, they never disclosed this exclusion possibility, number one. Number two, they never responded to comments that specifically asked what the secretary was going to do about the turbocharging hospitals. And number three, they specifically never responded to the very specific proposal that was presented by the Federation of American Hospitals that said that you need, the secretary, if you're going to include this inflation factor, you're going to need to do something with those cost-to-charge ratios. And what we want you to do is project them using a cost-inflation factor that the secretary herself had incorporated into each of her final rules under the prospective payment system process. So, Your Honor, the problem isn't that it was like a final or binding policy. The problem is that under the decisions of this case, the decision below turns its back on decades of authority from all three branches of government. Congress made clear in the APA and the notice and comment provisions and in the judicial review provisions that the secretary has to explain what she's thinking, explain the facts behind it, and explain the conclusions. For more than two decades, the executive order said when a document goes, when a proposed rule or final rule goes to OMB for review, once it's finalized, it needs to be disclosed to the public, not concealed as it was here. And this Court has said that there's a presumption in favor of release of information, of disclosure of information. This document, the IFR, is not privileged. There's no claim of privilege associated, no attorney-client, not even a deliberative process privilege. Why wouldn't it be a deliberative process? Because by definition, it's not a deliberative process because it is the final agency determination. That's why Executive Order 12866 mandates that it be a public document. There is nothing deliberative about it. And Judge Huvel, in her decision, acknowledging that it needed to be a part of the record here, said that it had none of the hallmarks of deliberation. There was no one asking a question. There was no exchange. It was simply the agency saying... Well, it's hard for me to think that there was no exchange because they withdrew it, so something was happening. Oh, absolutely, Your Honor. As Administrator Scully said, they withdrew it after OMB said, you've been wrong, you, the expert agency, have been wrong in the past, so we think you're wrong now. This was not where the secretary voluntarily changed her mind. Like we have the example of one of the cases where it gets to the Federal Register and the agency pulls it back. This is not... The agency didn't change its mind. And the agency yielded to budget analysts at OMB. Those budget analysts do not have the delegated authority from Congress to adopt Medicare policy. And the court should not be deferring to a tainted policy. The court should be deferring to what's in the IFR because that is where the agency, unalloyed, said, here's what should be done. And what should be done is that the turbocharging data needs to be excluded, entirely excluded, because although we can quantify what has happened charge-wise, we do not know where they're going to be cost-to-charge ratio-wise. And it will so skew the data that the secretary would violate the statutory requirement to pay at least 5%. That's what it said. They abandoned the methodology in the sense that they were forced to react to what they were required by OMB. But this was not the agency's considered opinion. No. Okay. We'll give you some time and reply. Okay. Thank you. I've saved 4 minutes for rebuttal. Mr. Liu. Good morning, Your Honors. May it please the Court. James Liu for Secretary Burwell. Your Honors, the District Court correctly upheld the agency's actions under the Arbitrary and Capricious Standard. Plaintiffs here are seeking higher Medicare outlier payments for federal fiscal years 2004, 2005, and 2006. Now, before the beginning of each federal fiscal year, CMS, the Centers for Medicare and Medicaid Services, prospectively sets a cutoff point called the Fixed Loss Threshold. And that cutoff point is used during the fiscal year to calculate the amounts of outlier payments. The Fixed Loss Threshold is set based on projections that CMS makes of Medicare payments for the coming year, which it produces by running historical charge data through the payment rules that will be in place in the coming year. The plaintiffs are alleging that the methodology that the Secretary employed in making those projections for these three years were arbitrary and capricious, and that led to the cutoff point being set too high and their payments being too low. Now, I think it's important to mention that, you know, there's been a lot of discussion of the fiscal year 2003 Fixed Loss Threshold and also the June 2003 rule that addressed turbocharging, and I believe the plaintiffs would agree did so with a great degree of success. Neither the fiscal year 2003 threshold nor the June 2003 rule addressing turbocharging is directly at issue in this case. The plaintiffs are challenging the Fixed Loss Threshold determinations for fiscal year 2004, 2005, and 2006. Do you have the authority... Does HHS have the authority to deny all outlier payment to a specific hospital? Your Honor, it doesn't appear so. In County of Los Angeles, the Court of Appeals... At least the Secretary has interpreted the statute as requiring her to make outlier payments. Certainly, the language of the statute, you know, potentially could support a different interpretation, but under the Secretary's current interpretation, she's required to make outlier payments. If I understand your question correctly, it's whether the Secretary could simply not make any outlier payments at all. Well, to one of these turbochargers, I mean, did anything happen to these hospitals that were gouging the... Your Honor, I'm not sure what's in the record about the turbochargers, but there have been numerous actions against turbochargers, asking hospitals to return money, also civil proceedings, and I believe there's even been criminal proceedings. So certainly the agency has taken action against turbocharging, not just in changing... revising the rules in June 2003 to prevent turbocharging, but also going after these violators after the fact. But there wouldn't be any retroactive adjustment. Is that correct? Your Honor, I believe that... Oh, we don't know. I believe that there's been some efforts, and I believe some of those efforts have been successful. Again, I don't think the details are in the record, but some funds have been, I believe, recovered from turbocharging hospitals. All right. You know, I can't tell you the precise details of those proceedings, though. Can you describe this MedPAR data in the supplementation of the administrative record, what the MedPAR data is? Yes, Your Honor. As I mentioned, each year, when making the projections of Medicare payments for the forthcoming year, the Secretary employs historical charge data. So, for instance, going back two years and looking at what hospitals' charges were for that year two years ago. Now, that charge data is contained within these MedPAR files, which are Medicare Provider Analysis and Review. That's what MedPAR stands for. That contains the charge data that the Secretary, or CMS, uses in making the projections. All right. And are they confidential? How do you treat them? How does the agency treat them? Your Honor, they are confidential, given that they contain very detailed data about treating specific patients. And in this case, they were included in the administrative records for the challenged actions and provided to the plaintiffs under a protective order. All right. Thank you. Your Honor, this Court has recognized that projections and forecasts are by nature speculative, inexact, and riddled with uncertainty. And that's especially true for outlier payments because outlier payments are intended to address cases that are aberrational. And the Court in County of Los Angeles discussed this at length. So, predicting outlier payments requires that the agency predict the most unusual, the most rare cases. It's not simply the most expensive cases. It's the cases that diverge in cost very far from the average for that particular kind of case. So a particularly costly disease to treat wouldn't necessarily receive an outlier payment. It would only be if a particular case involved costs that far exceeded the average for that case. Could I ask you, the district court relied in part on the fact that the interim final rule was not a final rule as such and that during the comment period the secretary was unprompted by any comments either that she should apply what I'll call the interim final rule methodology or the concern about these turbochargers. Is that your recollection of the record? Your Honor, I believe yes, I do understand that the district court explained that there were no comments regarding the particular proposal of excluding 123 hospitals. And you heard counsel for appellants state that there were such comments. Your Honor, I think the divergence here would be, first of all, it's important to make clear that what the plaintiffs refer to as the interim final rule of February 2003 draft was not submitted for comment. The February 2003 draft No, I understand. But in setting the 2004, 2005, and 2006 Yes, in the fiscal year 2004 determination, the plaintiffs are correct that commenters asked the secretary to take into account the fact that there had been turbocharging when making her projections. However, there was no or the plaintiffs haven't pointed to any specific comment specifically proposing that these 123 hospitals be excluded. Now the secretary I think where the plaintiffs go wrong is when the plaintiffs claim that the secretary didn't address these comments at all. The secretary actually addressed these comments at length went through various proposals that people had that commenters had submitted and explained that she was going to the option that she was going to use was to employ newer data in calculating and making her projections specifically she was going to calculate new cost to charge ratios for hospitals to reflect the use of tentative settled cost reports under the new June 2003 rule and the district court explained this on page 17 of its opinion and the plaintiffs haven't addressed that explanation at all so it's certainly not the case that the agency did not address the comments or the issue of turbocharging or the changes in that had been contained in the June 2003 rule that addressed turbocharging and your honor with respect to the 2003 draft again this is an internal draft that was rejected the draft discussed three proposed I'm sorry the draft discussed four potential rule changes and the agency included three of those rule changes in its proposed rule issued in March 2003 but it decided against the proposal to change the fixed loss threshold and the agency explained in the proposed rule the March 2005 I'm sorry the March 2003 proposed rule that the reason it was not it was proposing not to change the fixed loss threshold was because of extreme uncertainty about the effects of aggressive hospital charging practices that is turbocharging on fiscal year 2003 outlier payments and that's at 68 Federal Register 10,426 so the agency to the extent that there was any obligation to explain their change in approach which we believe there was not the agency did provide an explanation of the course that it was taking but again we don't believe that the agency had an obligation to explain its departure from an internal draft that was rejected and the plaintiffs haven't provided any support for on views stated in preliminary draft and we have pointed to a number of cases showing that preliminary views and interagency deliberations are not relevant in judicial review and that the agency does not have to explain its departure from preliminary views I point to National Association of Home Builders PLMRS Narrowband Corporation decision this court's decision in San Luis Obispo Mothers for Peace pointing out that internal agency deliberations are not a proper subject for judicial review that's why I asked you about comments because you have said the agencies are supposed to respond to substantive non-frivolous comments yes and the agency did that in each of the determinations for fiscal years 2004, 2005 and 2006 and the district court walked through the agency's responses to those comments it's simply not true that the agency didn't address the comments your honor the point that I just made sort of goes hand in hand with the proposition that we have also set forth which is that this draft shouldn't have been included in the record at all given that records of internal agency deliberations typically aren't considered part of a record for judicial review have we had a case like this though where the agency has totally signed off and as appellant counsel suggests a man or woman with a green eye shade rejects it I think the answer to that would be yes we have had a case like this but it's not a case where the agency totally signed off this is not a case where the agency totally signed off well I gather in submitting a proposal to OMB the agency is saying this is what we want please approve it and OMB says for it's reasons policy reasons we have problems with it and so we will not approve it no your honor I don't think that's a fair characterization fair characterization of what? of the rule making process the rule making process is continuing until it's over under PLMRS narrow band right but all I'm getting at is is there no distinction along the lines appellant's counsel suggested no I don't think that's if you're asking about the significance of a signature I think the case that I point you to would be Pentecost Utah Copper Corporation where the agency had actually signed this document sent it on for publication it wasn't published and a few years down the road plaintiffs challenge a different rule that departs from that unpublished rule and the court finds that it was never a rule and therefore doesn't have to be revised through notice and comment plaintiffs haven't addressed Pentecost Utah Copper Corporation in any sort of or in any meaningful fashion your honor so your honor at that point the agency had not finalized the rule it was going through interagency review and the agency was free to return to the rule and change its mind and that's what the agency did and the agency explained in the March 2003 proposed rule that that was now not proposing any change to the fiscal year 2003 fixed loss threshold I believe my time is up unless the panel has any further questions let me ask you I didn't want to take your time but can you address and I will ask Mr. Roth his interpretation it's outside this record but it's a matter of record is this an ongoing is this still going on are we going to see for fiscal year 789 and so forth the same problem with the turbo chargers what has happened in the interim with the turbo charging your honor I believe the fiscal year 2003 rule has effectively has been very effective in combating the problem of turbo charging so I think we're really looking at this three year period we're looking at this three year period but we won't look at it we don't expect to be looking at this in the future looking at the turbo charger factor in determining the outlier threshold your honor I believe there is other litigation pending and I believe the amici have are plaintiffs in other litigation challenging other fiscal years I'm not certain exactly what their how far along the years are but I think parts of their claims involve questions of whether the agency adequately took into account the effects of turbo charging is that since 2003 are the fiscal years that they're questioning since 2003 they're definitely challenging in that other litigation some fiscal years after 2003 I don't know exactly which years I certainly know in one case in which I'm actually counsel they are challenging fiscal years 2004, 2005 and 2006 which are the years challenged here and they're also challenging fiscal years fiscal year 2007 which is the following year but your honor I think it's important to make a distinction here between one the problem of turbo charging which I believe the plaintiffs would agree was thoroughly addressed by the June 2003 rule and second would be the problem of how to address the effects of the June 2003 rule in the projection models and I think those are two separate questions and I think pretty much there's agreement on, there's agreement that the June 2003 rule addressed the problem of turbo charging the disputes are about whether the agency should have done more than it did to address to take into account the effects of the June 2003 rule in making its projections and as we've explained the agency has taken into account in each of the years since 2003 the effects of that June 2003 rule Thank you Mr. Roth Okay Let's see, why don't you take a couple minutes and then if you want to give your version of present day before that won't count or you might want to wait until you have, why don't you say what you have to say in rebuttal and then give your version of where we are today with respect to Thank you, I'll try to be quite succinct, let me start with that As the secretary wrote in her brief they were unable to identify any related cases There is not, this issue, because of the way the data catches up we don't believe this is an issue after 2006, that's not part of our case because as you see the thresholds got better and better and better from the hospital's perspective and I think the payment levels in 2007 and beyond were basically acceptable So I don't think there is, and the secretary has never identified any related case We identified the amici as being kind of somewhat related to outliers generally but not focused as this case is on this particular issue which led to the secretary's I'm going to try to be very succinct here Judge Rogers there was in fact these comments and they weren't addressed thoroughly The Federation of American Hospital in 2004 alone gave 8 pages single spaced only on the outlier threshold and in doing so they said there's a mismatch there's a mismatch between the charge data and the cost to charge ratios and what Judge Udall said below is that there weren't any concrete suggestions well that's just not what the record says the record says here's the suggestion, project cost to charge ratios and what's amazing your honor is that that's what the secretary did in 2004 it said well we're going to try and do that it said attempt for 50 hospitals and then abandon it and had in fact she done that for the 123 and continued to do that, this case wouldn't exist second point, again Judge Rogers there was no retroactive correction until the rule came in in 2004 and the rule for 2004 said if we found that you've overpaid we're going to get the money back with interest that's unprecedented, it doesn't exist anywhere else in the Medicare program where the agency can go back and impose interest what was made years ago under the debt collection improvement act there has to be 30 days notice before a debt can accrue interest so it ended turbo charging we certainly agree with the government on that and having ended turbo charging, the secretary knew in the interim final rule that turbo charging had ended and so what the secretary said there is because turbo charging has ended we have to take special account for these 123 hospitals and she did that in the interim final rule for some reason after talking to OMB the secretary decided not only did she have to not account for them she didn't even have to disclose the fact that she thought that the most appropriate and statutorily required approach was to eliminate the data from these turbo charging hospitals so the now this is as far as we were able to tell a case of first impression on the question of what happens when a rule goes to OMB and the reason because we couldn't find another instance where the agency concealed it because what executive order 12866 says is it's in the record that the executive order requires the agency to identify for the public in a complete clear and simple manner the substantive changes between the draft submitted to OIRA which is the agency within OMB that reviews these regulations for review and the action subsequently announced and is required to identify changes in the regulatory action that were made at the suggestion or recommendation of OIRA there is no question that the executive branch has for decades now that goes back to 1993 but they were predecessors recognized that these kinds of actions have to be disclosed to the public and so what the government's response is to say is well what judge Huvel meant was that there wasn't a comment that said exclude the 123 turbo chargers well there was a comment that said and I quote this is the summary the secretary said one commenter requested that CMS factor in the calculation of the threshold the fact that certain hospitals have distorted their charges significantly then you have 8 single spaced pages where the federation of American hospitals runs item by item identifying and quantifying each aspect of the outlier correction rule asking the secretary to take account of each of them and ends up at 25,000 for 2004 but says we can't take into account reconciliation the secretary ultimately did try to take into reconciliation and brought it down from 50,000 to 33,000 but judge Henderson the 50,000 that the of 2003 at the same time that was just 2 months after she had submitted her interim final rule which said that the outlier threshold had to be 20,760 at the same time that the administrator of CMS said that the threshold had to be around 22 or 23,000 dollars and that was corroborated by the actuaries so what we think happened here is that the secretary came up with some kind of make weight or pretend outlier threshold and then congratulates itself in the final rule for coming down so far and the government says in thoroughly addressing these comments those thoroughly addressing amounted to one paragraph that said give us credit look how much we've taken down the threshold well the problem isn't how much the threshold went down it's the fact that it didn't go down sufficiently well if it was set artificially high to begin with then the fact that it went down is irrelevant that's our point your honor is that we took county seriously we didn't take a quantitative approach here what we did is we took a qualitative and methodological approach here the secretary knew that the turbo charging data had to be eliminated it skewed the inflation data and it also skewed the cost of charge ratio data and so in the interim final rule took it out put the threshold in the low 20s the administrator said it should be the low 20s it turns out it should have been in the low 20s that's where the comments were in the low 20s everything was in line here except the secretary's own rules and in concealing the IFR it actually did the one thing that this court said decades ago that shouldn't happen in the in the notice and comment process and that is that the that it shouldn't be turned into some kind of quote unquote charade that the secretary should in good faith simply reveal to the regulated entities what she was thinking and having done that it then gives the opportunity for there to be meaningful comment the Kennecott case which the secretary says we didn't address well of course we addressed it the question came up was that was a comment question a question about commenting on some previous rule that was taken away it did not have anything to do at least from our perspective with a situation where the deferential power of the secretary was invested in a document that the secretary later refused to reveal actively concealed and then didn't address causing a procedural irregularity in this final rule and the outlier thresholds for all three years can I just ask you briefly what what do you think the purpose of submitting this to OMB is just your your idea of it what is it what is OMB empowered to do once it gets the IFR OMB is empowered to do I think precisely what it did it's in power to say you know we're going to look at what you did we're going to be the eyes and ears we're looking at the government totally we want to kind of check what you've done we're not here questioning the role of OMB the fault here with us from our perspective is the secretary the secretary could have adopted the OMB budget analyst position as her own but simply needed to explain why it was okay to include turbocharging hospital data in the inflation figure but not make any mitigating change to the cost to charge ratios had the secretary done that in other words the secretary could have done one of two things either eliminated the data altogether or included the data from the turbocharging hospitals for purposes of inflation and also include mitigating cost to charge ratios but the secretary did the one thing that she couldn't do which is include the data for purposes of inflation the charges inflating the charges but do nothing on the cost to charge ratio side and Judge Uvell was wrong was flatly wrong when she said that the hospitals didn't address this didn't comment on it and didn't propose an alternative it proposed an alternative but had it been given the secretary's alternative I think it would endorse the secretary's alternative and saying that one or the other was necessary but what the secretary done what would have led the secretary knew would have led to an underpayment under the statutory floor okay thank you very much
judges: Henderson, Rogers, Brown